IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| ALLY FINANCIAL, INC., a Delaware Corporation, | ) ) ) | Case No. 4:15-cv-00051-SMR-HCA |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| THOMAS D. GRETTER, an Individual; GRETTER, an Individual, | ) ) ) | ORDER ON DEFENDANT JOHN D. GRETTER'S MOTION TO DISMISS |
| Defendants. | ) ) | |

Defendant John D. Gretter's ("Gretter") motion to dismiss is before the Court. [ECF No. 16]. Gretter challenges Ally Financial, Inc.'s ("Ally") claim for conversion. The motion became ripe on July 2, 2015, and no hearing is necessary on the matter. For the reasons outlined below, the motion is DENIED.

## I. BACKGROUND

### *A. Jurisdiction*

The Court's jurisdiction over this case is based on diversity. Complete diversity exists between Plaintiff and each Defendant. The amount in controversy exceeds $75,000.00, exclusive of interests and costs. Consequently, diversity jurisdiction is appropriate. 28 U.S.C. § 1332(a)(1). Venue is proper under 28 U.S.C. § 1391(b)(2).

### *B. Factual Allegations*

Ally alleges the following facts in its Complaint [ECF No. 1], accepted by the Court as true. Ally is the successor in interest by name change to GMAC INC., GMAC LLC, and General Motors Acceptance Corporation. Thomas Gretter and John Gretter both served as officers of

Gretter Ford Mercury, Inc. and Gretter Autoland, Inc. (collectively "Dealerships"). Gretter Ford Mercury, Inc. and Gretter Autoland, Inc. were at all relevant times auto dealerships selling new and used vehicles.

Ally provided both Dealerships with financing for the acquisition of vehicles. Under the terms of the agreement, the Dealerships promised to pay Ally the amount that Ally advanced for the purchase of vehicles, with interest. Several financing agreements and related security agreements govern the agreement. Both the Gretter Ford Wholesale Security Agreement and the Gretter Autoland Wholesale Security Agreement (collectively "WSAs") provide "that as each vehicle is sold, or leased, [the Dealership] will faithfully and promptly remit to [Ally] the amount [Ally] advanced . . . with interest." *Id.* at 26, 63.

In exchange for financing, the Dealerships granted Ally security in:

1. all new and used vehicles;
2. all then-existing or after-acquired inventory, equipment, fixtures, accounts receivable, contract rights, securities, cash, general intangibles, documents, instruments, chattel paper, and proceeds thereof;
3. then-existing or after-arising accounts, contract rights, money, receivables, factory open accounts; and
4. all property.

In addition, both Thomas and John Gretter personally guaranteed the loans.

Ally commenced an audit on October 15, 2014. The audit revealed the Dealerships had sold eighty-five vehicles without subsequently remitting the corresponding loan amounts to Ally. The Dealerships had deposited the proceeds from these eighty-five vehicles into an account and paid other third parties from these proceeds instead of remitting the money to Ally. When a vehicle financed by Ally is sold and the proceeds are not remitted to Ally to repay the loan, this creates a

-2-

"sales-out-of-trust" situation. As Ally explains, "This is a serious breach of the Loan Agreements because Ally has lost its Vehicle Collateral and the Dealerships have received the proceeds from the sale or lease of those Vehicles and used the money for other purposes—effectively reducing Ally's Collateral that secures its loans to the Dealerships." *Id.* at 10. Ally labels the failure to pay proceeds a default. *Id.*

Ally discovered the Dealerships had entered into loans with other lenders for amounts totalling more than $1,000,000. Additionally, between June 19, 2014, and October 6, 2014, Thomas Gretter obtained four personal loans totalling $1,320,000. In October 2014, the Dealerships were making daily payments of $14,000 on these business and personal loans, taking the money from the proceeds due to Ally.

Ally also determined the Dealerships had been submitting Operating Reports that did not truthfully or accurately reflect the Dealerships' financial condition. The Dealerships' accounting records were manipulated to conceal the Dealerships' losses and increasing debt, as well as to conceal their failure to repay loans to Ally when vehicles were sold. In regard to thirteen of the eight-five vehicles, Gretter had misrepresented to Ally during a June 26, 2014, audit that the vehicles were not on the Dealerships' sales lots "because they were 'test drives' or 'demonstrators.'" *Id.* at 12. In actuality, the Dealerships had sold those thirteen vehicles.

On October 17, 2014, Ally notified the Dealerships that they were in default and demanded payment in full for the eighty-five vehicles, in an amount totalling $3,111,364.80. Ally also suspended the Dealerships' credit lines. As of October 17, 2014, the Dealerships were indebted

to Ally for a total amount of $10,114,629.01, exclusive of interest and other charges.[1]  On October 23, 2014, Ally further demanded the Dealerships surrender all of Ally's collateral.  The Dealerships refused to do so.  On December 1, 2014, the Dealerships filed Chapter 11 bankruptcy.

### C.  Relevant Procedural Background

Ally filed this lawsuit on February 13, 2015, alleging four causes of action: 1) breach of personal guaranties, 2) conversion, 3) fraud, and 4) negligent misrepresentation.  [ECF No. 1].  Ally cited the Dealerships' use of proceeds to repay other loans as the act underlying its conversion claim.

On June 3, 2015, Gretter filed the motion currently before the court, his Motion to Dismiss Plaintiff's Second Claim for Relief (Conversion) ("Motion").  [ECF No. 16].  Gretter filed a brief in support of this motion.  [ECF No. 16-1].  Ally filed a response [ECF No. 20] and Gretter filed a reply [ECF No. 28].

## II.  ANALYSIS

### A.  Standard for Rule 12(b)(6) Dismissals

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of the . . . claim is and the grounds upon which it rests[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Zayed v. Associated Bank, N.A.*, 779 F.3d 727, 732 (8th Cir. 2015).  Rule 12(b)(6) governs motions to dismiss for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss, "a complaint must contain sufficient factual

---

[1] As of February 11, 2015, the Dealerships have reduced this amount to $8,568,177.86, exclusive of interest and late fees.

matter, accepted as true, to state a claim to relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (internal quotation marks omitted) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Twombly*, 550 U.S. at 570. Though not a "probability requirement," the *Twombly/Iqbal* plausibility standard requires that plaintiff show that "success on the merits is more than a sheer possibility." *Braden*, 588 F.3d at 594 (internal citation and quotation marks omitted). A claim meets the plausibility standard when the court can draw from its factual allegations a reasonable inference of defendant's liability for the alleged misconduct. *Iqbal*, 556 U.S. at 678. A motion to dismiss should be granted "only in the unusual case in which a plaintiff includes allegations that show, on the face of the complaint, that there is some insuperable bar to relief." *Strand v. Diversified Collection Serv., Inc.*, 380 F.3d 316, 317 (8th Cir. 2004) (internal quotations omitted); *accord Benton v. Merrill Lynch & Co.*, 524 F.3d 866, 870 (8th Cir. 2008).

In reviewing a claim for plausibility, courts rely on the following principles. First, they take plaintiff's factual allegations as true but may set aside legal conclusions. *Braden*, 588 F.3d at 594 (citing *Iqbal*, 556 U.S. at 678). Second, courts draw any reasonable inferences that may be drawn in favor of the non-movant. *Iqbal*, 556 U.S. at 678. Next, they read the complaint as a whole, without viewing each allegation in isolation. *Braden*, 588 F.3d at 594. Finally, courts draw on their judicial experience and common sense in evaluating a complaint in context. *Id.* (citing *Iqbal*, 556 U.S. at 679).

State substantive law controls state law claims before federal courts sitting in diversity. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *In re Baycol Prods. Litig.*, 616 F.3d 778, 785 (8th Cir. 2010). Iowa law thus governs the substantive matters in this case.

*B. Law on Conversion*

The Iowa Supreme Court has delineated the elements of conversion as "1) ownership by the plaintiff or other possessory right in the plaintiff greater than that of the defendant; 2) exercise of dominion or control over chattels by defendant inconsistent with, and in derogation of, plaintiff's possessory rights thereto; and 3) damage to plaintiff." *Matter of Estate of Bearbower*, 426 N.W.2d 392, 394 (Iowa 1988). The Restatement (Second) of Torts, section 225, clarifies that an individual is liable for conversion if the plaintiff "was entitled to <u>immediate possession</u> of the chattel." Restatement (Second) of Torts § 225 (emphasis added).[2] In determining whether a defendant's interference with a plaintiff's property right is serious enough to amount to conversion, courts should consider:

(a) the extent and duration of the actor's exercise of dominion or control;

(b) the actor's intent to assert a right in fact inconsistent with the other's right of control;

(c) the actor's good faith;

(d) the extent and duration of the resulting interference with the other's right of control;

(e) the harm done to the chattel;

(f) the inconvenience and expense caused to the other.

*Kendall/Hunt Pub. Co. v. Rowe*, 424 N.W.2d 235, 247 (Iowa 1988) (quoting Restatement (Second) of Torts § 222A(2)).

---

[2] Iowa courts have frequently cited the Restatement provisions governing conversion with approval. *See, e.g.*, *Kendall/Hunt Pub. Co. v. Rowe*, 424 N.W.2d 235, 247 (Iowa 1988); *Ezzone v. Riccardi*, 525 N.W.2d 388, 396 (Iowa 1994); *Welke v. City of Davenport*, 309 N.W.2d 450, 452 (Iowa 1981); *State v. Hollinrake*, 608 N.W.2d 806, 808 (Iowa Ct. App. 2000). Ally does not dispute that the right to immediate possession is an element of conversion.

*C. Possessory Right to the Proceeds*

Gretter asserts Ally has not sufficiently pled the first element of conversion, namely that Ally had a right to immediate possession of the proceeds. Gretter claims Ally cannot prove it had a right to immediate possession of the proceeds because: 1) the security agreements did not grant Ally an immediate possessory right in the proceeds [ECF No. 16-1 at 15–19]; 2) Ally has not alleged the Dealerships were in default at the time of the alleged conversion, *id.* at 11; and 3) Ally did not make a demand prior to the alleged conversion, *id.* at 14–15. Gretter's "immediate possession" arguments are premised on two propositions: 1) Ally did not have a possessory interest in the proceeds until Gretter was in default, and 2) Gretter was not in default until Ally sent its demand letter on October 17, 2014. The Court examines these propositions in turn.

1. Ally has Sufficiently Pled it had a Possessory Right Prior to Default

Though Gretter's argument is premised on the assumption that default was necessary to create a possessory interest, Gretter fails to provide any persuasive legal authority substantiating this assumption. Iowa Code section 554.9609(1)(a) provides that a secured party may take possession of collateral after default, but does not preclude the existence of a possessory interest prior to default. The cases Gretter cites as authority for the proposition that "the existence and timing of a default is critical to show when Plaintiff had a right to immediate possession," [ECF No. 16-1 at 13], are distinguishable based on the specific contractual language at issue in those cases. In *First National Bank of Glendale v. Sheriff of Milwaukee County*, the governing security agreement "contemplate[d] that until the occurrence of a default or any other event which would cause the plaintiff to deem itself insecure, the debtor, rather than the secured party, had the right to possession of the furniture" and "[t]here was no evidence that the plaintiff deemed itself insecure

or for any other reason demanded possession of the furniture from the debtor." 149 N.W.2d 548, 549–50 (Wis. 1967). Similarly, in *United States v. Fullpail Cattle Sales, Inc.*, the contract required the satisfaction of two conditions before the plaintiff had a right to immediate possession. 640 F. Supp. 976, 980 (E.D. Wis. 1986). These cases demonstrate that a party's possessory interest is governed by the language of the contract.

Ally argues the terms of its agreements with the Dealerships granted it an immediate possessory interest in the proceeds of sold or leased vehicles, even prior to default. First, the WSAs provide "that as each vehicle is sold, or leased, [the Dealership] will faithfully and promptly remit to [Ally] the amount [Ally] advanced . . . with interest."[3] [ECF No. 1 at 26, 63]. Ally also points to language in the WSAs stating Ally's "security interest in the vehicles shall attach <u>to the full extent provided or permitted by law</u> to the proceeds, in whatever form, of any retail sale or lease thereof by [the Dealerships] until such proceeds are accounted for." *Id.* (emphasis added). Iowa Code section 554.9607(1)(b) provides, "<u>If so agreed</u>, and in any event after default, a secured party . . . may take any proceeds to which the secured party is entitled." (Emphasis added). Ally reasons that the "full extent" language in the WSAs amounts to an agreement that Ally may take proceeds to which it is entitled, even prior to a default.

Gretter responds that a contractual right to repayment "faithfully and promptly" does not equate to a possessory right, but does not support this assertion with any legal authority. Gretter further argues the WSAs explicitly grant Ally only the right to take immediate possession of the

---

[3] The security agreements also explicitly create a security interest in the proceeds of vehicle sales. This security interest in the vehicle proceeds is buttressed by Iowa Code section 554.9315(1)(b), which provides that, when collateral is sold, "a security interest attaches to any identifiable proceeds of collateral."

vehicles under certain circumstances, and that the selective omission of the right to take immediate possession of proceeds means Ally had no such right. [ECF No. 16-1 at 16–18].

The Court finds Ally has sufficiently pled its right to immediate possession of the proceeds based upon the contractual requirement that the Dealerships "faithfully and promptly remit" the proceeds to Ally. Ally has alleged that, pursuant to the WSAs, it was entitled to proceeds as soon as the Dealerships sold a vehicle. There is no contractual language requiring default before a possessory interest arises, despite any ambiguities alleged by Gretter. Accordingly, Ally claims no demand or default was necessary to trigger Ally's possessory interest. This is sufficient to survive Gretter's motion to dismiss.

2. Ally has Sufficiently Pled the Dealerships were in Default

Gretter's argument on this point is less than clear. In his Brief, Gretter argues, "even if it is properly alleged that the Dealerships were in default at the time of alleged conversion," a demand was required to create a possessory right. [ECF No. 16-1 at 14]. Thus, Gretter initially assumed for the sake of argument that Ally had sufficiently pled default, but argued the legally significant action was Ally's demand. In Gretter's Response, however, he argues Ally has not alleged the Dealerships were in default. [ECF No. 20 at 3]. Gretter seems to suggest that it was necessary for Ally to make a demand and for the Dealerships to refuse that demand before a default existed. *Id.* In any event, Gretter's arguments are unavailing.

Under Iowa Code section 544.9609(1)(a), a secured party is entitled to possession after a default. Nothing in the Iowa Code suggests a secured party must make a demand before a default arises. As the Iowa Supreme Court has explained, "demand and refusal are merely evidence of conversion"—not conditions precedent. *Brown v. Dubuque Altar Mfg. Co.*, 144 N.W. 613, 615

(Iowa 1913). Demand and refusal are necessary to prove conversion only when the defendant's possession was lawful in its inception. *Stanchfield v. Palmer*, 4 Greene 23, 24 (1853). In such cases, demand is necessary to alert the defendant that they must surrender possession.

But Ally has sufficiently pled the Dealerships' possession of the proceeds was not lawful since it was in contravention of their contractual obligation to remit the proceeds "faithfully and promptly." Rather, the Dealerships' possession and disposition of the proceeds was wrongful, and the Dealerships should not have needed a demand to know this. Moreover, there is no contractual language requiring Ally to make a demand for the proceeds before the Dealerships were considered to be in default. It is therefore reasonable to infer at this stage of litigation that Ally was not required to make a demand in order for a default to arise.

Ally has also sufficiently pled the Dealerships were in default at the time the alleged conversion occurred. Ally's Complaint asserts each sale-out-of-trust was a default. [ECF No. 1 at 10]. Each time the Dealerships sold a vehicle and failed to "faithfully and promptly" remit the proceeds to Ally, a default occurred and gave rise to a possessory interest per Iowa Code section 544.9609(1)(a). Any transfers of proceeds by the Dealerships to third parties necessarily occurred after default, at a time when Ally had an immediate possessory interest in the proceeds.

Gretter argues, "it is not at all clear that the Dealerships were in default" because "[a]t the time of the alleged conversion it is not at all clear that the Dealerships had failed to 'promptly' repay Ally." [ECF No. 16-1 at 12]. Clarity is not the standard for Rule 12(b)(6). Ally was entitled to possession upon default and Ally has sufficiently pled the Dealerships had defaulted. Ally has therefore stated a claim for conversion that is plausible on its face. *Braden*, 588 F.3d at 594.

*D. Conversion Claim for Money*

Gretter next asserts Ally cannot state a claim of conversion because no such claim can be made with respect to fungible money. For his sole authority on this issue, Gretter cites *De Kalb Bank v. Purdy*, 562 N.E.2d 1223, 1232 (Ill. App. Ct. 1990), which states, "Money cannot be the subject of conversion unless it is the specific coins and bills that are being sought by the plaintiff such as is the case with rare coins." To be sure, more than one hundred years ago, the Iowa Supreme Court stated, "there can be no conversion of money having no distinguishing 'earmarks.'" *Lee v. Coon Rapids Nat. Bank*, 144 N.W. 630, 634 (Iowa 1913).

But in a more recent opinion the Iowa Supreme Court recognized that deposited proceeds may be "clearly identifiable cash proceeds [of collateral]" and allowed a conversion action for such proceeds. *C & H Farm Serv. Co. of Iowa v. Farmers Sav. Bank*, 449 N.W.2d 866, 875 (Iowa 1989) (citing Iowa Code section 554.9306(2) (1981), which stated a security interest in collateral continues in identifiable proceeds of collateral[4]). In *C & H*, the Iowa Supreme Court concluded that a bank converted funds belonging to a secured party when the bank used secured proceeds deposited to a debtor's account to satisfy a bank loan. *Id.* at 878. Similarly, in *Linn Co-op. Oil Co. v. Norwest Bank Marion, N.A.*, the Iowa Supreme Court affirmed a decision finding a bank "had improperly converted to its own use the proceeds of a grain sale subject to the security interest of the plaintiff." 444 N.W.2d 497, 498 (Iowa 1989). These decisions suggest proceeds may be the subject of a conversion action, so long as the proceeds were clearly identifiable. *See also Whitfield & Eddy, P.L.C. v. Mitchell*, No. 04-1721, 710 N.W.2d 257 (Iowa Ct. App. 2005) (unpublished) (holding defendant's counter-claim was sufficient to survive motion to dismiss

---

[4] This provision is now found in Iowa Code section 554.9315(1)(b).

when defendant alleged he had a right to wheat proceeds and plaintiff refused to turn the proceeds over to him); 18 Am. Jur. 2d Conversion § 7 ("The general rule is that monies are intangible and, therefore, not subject to a claim for conversion; however, an exception exists when a plaintiff can allege that the defendant converted specific segregated or identifiable funds . . . .").

Gretter has not addressed the aforementioned Iowa cases or claimed the proceeds from the vehicle sales were not "identifiable." Ally, for its part, has provided a list of the eighty-five vehicles the Dealerships sold out of trust, with the corresponding loan balance on each vehicle. [ECF 1 at 10, 129]. Ally argues the proceeds of the vehicles sales were clearly identifiable at the point they were deposited into the Dealerships accounts. [ECF No. 20 at 13]. The Court agrees and finds Ally has sufficiently pled its entitlement to identifiable funds.

### E.  Sufficient Factual Matter

Finally, Gretter argues Ally has not pled sufficient facts to state a viable claim. [ECF No. 16-1 at 9]. He argues Ally has merely provided a formulaic recitation of the elements. *Id.* The Court disagrees.

As already discussed, Ally has sufficiently pled its entitlement to possession. Gretter does not dispute that Ally has sufficiently pled the third element of conversion, damages. As for the second element of conversion—"exercise of dominion or control over chattels by defendant inconsistent with, and in derogation of, plaintiff's possessory rights thereto"—Ally has pled the Dealerships paid other debts with the money due to Ally. Ally alleges Gretter, as an officer of the Dealerships, participated in this. *See Briggs Transp. Co. v. Starr Sales Co.*, 262 N.W.2d 805, 809 (Iowa 1978) ("Directors or officers of a corporation may be presumed to have knowledge of the financial affairs of their corporation when making statements concerning its financial condition.

It is not necessary that they know such statements to be false and fraudulent, it is their duty to know them to be true, and they are liable in damages to anyone dealing with the corporation, relying on the truth of such false or fraudulent financial reports."). Ally further asserts the Dealerships engaged in deceptive accounting practices and submitted false reports that hid the Dealerships' true financial conditions. Ally alleges Gretter himself misrepresented that certain sold vehicles were not on the lot because they were being used as test drives or as demonstrators, when they had actually been sold.

These facts are sufficient to state a claim for conversion. Several courts, applying 11 U.S.C. § 523(a)(6),[5] have found similar facts amount to conversion. *See, e.g.*, *In re Therous*, No. 94-50530, 1995 WL 103342 at *3 (5th Cir. Feb. 27 1995) (unpublished) (finding business owner committed conversion because "it [was] reasonable to infer [the experienced businessman] knew that selling mobile homes out of trust jeopardized [the lender's] security interest"); *Ford Motor Credit Co. v. Owens*, 807 F.2d 1556, 1559 (11th Cir. 1987) (finding dealership officer "actively participated in the conversion because he made the decision to dispose of the automobiles and not to turn over the proceeds to [the lender]"); *In re Penton*, 299 B.R. 701, 706 (Bankr. S.D. Ga. 2003) (finding dealership officer who sold vehicles without remitting proceeds to lender committed conversion); *In re Routson*, 160 B.R. 595, 603 (Bankr. D. Minn. 1993) (finding dealership officer who sold thirty vehicles out of trust and used proceeds to pay those other than secured party committed conversion). Moreover, the viability of a conversion claim should be determined based on consideration of the factors listed by the Iowa Supreme Court in *Kendall/Hunt*. *See Sioux*

---

[5] 11 U.S.C. § 523(a)(6) states that a discharge in bankruptcy will not be granted "for willful and malicious injury by the debtor to another entity or to the property of another entity."

*Biochemical, Inc. v. Cargill, Inc.*, 410 F. Supp. 2d 785, 802 (N.D. Iowa 2005) (concluding the same and denying motion to dismiss conversion claim). "[C]onsideration of these factors is best conducted on a complete record, such as on a motion for summary judgment." *Id.*; *see also Sagez v. Global Agric. Investments, LLC*, No. 11-CV-3059-DEO, 2014 WL 3779072, at *24 (N.D. Iowa July 31, 2014) (holding that whether plaintiffs would be able to prove conversion claim "is a matter more appropriate for the summary judgment stage"). Thus, the Court finds Plaintiff has pled sufficient facts to present a viable claim.

### III.  CONCLUSION

For the foregoing reasons, Gretter's Motion to Dismiss Plaintiff's Second Claim for Relief (Conversion) [ECF No. 16] is DENIED.

IT IS SO ORDERED.

Dated this 8th day of October, 2015.

STEPHANIE M. ROSE
UNITED STATES DISTRICT JUDGE